## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

PAUL SUGAR, Jr., and PAUL SUGAR, Sr.,

      Plaintiff,

    vs.                         No. CV  20-00331 KWR/LF

DAVID TACKETT,

      Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiffs Paul Sugar, Jr. and Paul Sugar, Sr.[1] have brought a Complaint against Defendant David Tackett alleging that Defendant made misrepresentations and/or committed fraud by inducing Plaintiffs to agree to the sale of 11,599.04 pounds of No. 8 Turquoise ("No. 8 Turquoise"). Plaintiffs allege that Defendant breached that contract and his attendant implied contractual duty of good faith and fair dealing when he never paid Plaintiffs $ 560,000.00 for the No. 8 Turquoise. Plaintiffs further allege that when Defendant later sold the No. 8 Turquoise without remitting any funds to Plaintiffs, Defendant committed the tort of conversion and was unjustly enriched by the proceeds of that sale. Plaintiffs ask for payment under the contract or rescission of the agreement. They also seek compensatory damages, punitive damages, pre and post judgment interest, and an award of attorney's fees and costs. *See* Doc. 1.[2]

---

[1] Plaintiffs will be referred to jointly as "Plaintiffs," and individually as "Paul Sugar, Jr." and "Paul Sugar, Sr."
[2] In his briefing, Defendant also asks for attorney's fees and costs. As Defendant's request was not properly presented to the Court in a counterclaim, the Court will not consider this request.

On June 13, and June 14, 2022, the Court conducted a bench trial. After considering the briefs, the arguments of counsel, and all exhibits, the Court finds that Plaintiffs met their burden and showed that they had an oral contract with Defendant, but Plaintiffs did not show that Defendant breached the contract, nor did they meet their burden as to any of their other claims. Accordingly, the Court will find in favor of Defendant on all Plaintiffs' claims.

## I. FINDINGS OF FACT

The Court makes the following findings of fact:

### A. Transfer of No. 8 Turquoise

1. Beginning in 2016, Plaintiffs purchased, with cash, approximately 13,000 pounds of No. 8 turquoise ore from Dan and Pam Harrington, who live in Nevada. Doc. 102 at 22:11-12.

2. Plaintiffs paid between $30,000.00 to $40,000.00 cash for the No. 8 Turquoise. *Id.* at 22:11-12.

3. No. 8 Turquoise has a distinctive appearance and is in limited supply. *See id.* at 23.

4. Each Plaintiff owned approximately one-half of the ore. *Id.* at 51:25, 52:1.

5. After Plaintiffs sifted and cleaned the ore, it weighed approximately 11,599.04 pounds. *Id.* at 26:15-17.

5. Plaintiffs stored the No. 8 Turquoise in five-gallon buckets on Paul Sugar, Sr.'s property in Moriarty, New Mexico. *Id.* at 25:14.

6. Plaintiffs stabilized and sold some of the higher quality turquoise before entering into negotiations with Defendant. *Id.* at 28:6-8.

7. In 2017, Defendant contacted Paul Sugar, Jr. and expressed his interest in buying the Plaintiffs' No. 8 turquoise. The two engaged in negotiations for the sale. *Id.* at 30-31. Paul Sugar, Sr. did not participate in these negotiations. *Id.* at 88:14-17.

8.      During the negotiations Defendant discussed a permanent 2009 federal injunction with Plaintiffs.  *Id.* The 2009 injunction pertained to Elvin Jennings purchase of No. 8 Turquoise from the Fay Ward Estate (Ward Turquoise). *See* Ex. F at 14-17. Some of the Ward Turquoise was wrongfully removed before Mr. Jennings retrieved it. Defendant told Plaintiffs that their No. 8 Turquoise might be subject to the 2009 injunction. Doc. 102 at 31:8-12.

9.      On August 16, 2017, Paul Sugar, Jr. texted Defendant an address: 25 Dalton Place, Moriarty, New Mexico, 87035. This was Paul Sugar, Sr.'s address, and the place where Plaintiffs' stored their No. 8 Turquoise. Ex. 4 at 1.

10.     On August 16, 2017, Defendant's father, Steve Tackett, Jack Elkins and Josh went to Paul Sugar, Sr.'s address and took the No. 8 Turquoise from Moriarty, New Mexico to Flagstaff, Arizona. Doc. 102 at 67:14. Paul Sugar, Jr. and Defendant were not present when the No. 8 Turquoise was moved.

11.     For approximately 30 years, Paul Sugar, Jr. had known and trusted Jack Elkins. Mr. Elkins was part of Paul Sugar, Jr.'s "inner circle of friends" or "trusted circle." Also included in that trusted circle was Steve Harper, who Paul Sugar, Jr. had known for 35 years, and Frank Lente, who he had known for 10 years. Paul Sugar, Jr. had completed many deals with each of these men. *Id.* at 28-29.

12.     Steve Tackett, Jack Elkins, and Josh took the Plaintiffs' No. 8 Turquoise to Bleeker's Boxes, a storage facility in Flagstaff, Arizona. *Id.* at 37:22-23. The leasing contract with Bleeker's Boxes is dated August 1, 2017. *See* Ex. 2. Defendant rented the storage facility under the name "Paul Sugar." *Id.*

13.    Defendant signed the leasing contract with Bleeker's Boxes without Plaintiffs' knowledge or consent. Doc. 102 at 38.

14.    Sometime after the No. 8 Turquoise was moved to Flagstaff, Paul Sugar, Sr. met Defendant at Bleeker's Boxes. *Id.* at 89:11-13.  During the visit he saw the No. 8 Turquoise in the storage area. On that day, two locks were placed on the storage container. Defendant kept the key to one of the locks, and Paul Sugar, Sr. kept the key to the second lock. *Id.* at 90:5-12.

15.    On August 23, 2017, Defendant hand wrote a document memorializing that

> Paul Sr has done nothing wrong in my eyes
> Paul Sr did not in anyway know of any stolen material of #8 type.
> Paul  Sr has worked with me to recover any stolen #8 Rock and will continue
> I do not wish to accuse or harm him [sic] of any wrong doing in past or future.

The note is signed by both Defendant and Paul E Sugar, [Sr.] and dated August 23, 2017. Ex. 8.

16.    After Plaintiff's No. 8 Turquoise was moved to Flagstaff, both Jack Elkins and Defendant called Paul Sugar, Jr. and told him that there was 130,000 pounds of No. 8 turquoise for sale on the Asian market. Doc. 102 at 39:9-12.

17.    Defendant asked Paul Sugar, Jr. for his help in locating the seller of the No. 8 turquoise for sale in the Asian market. *Id.* at 39:18-22.

18.    Paul Sugar, Jr. told Defendant that the seller of the No. 8 Turquoise in the Asian market was Pam and Dan Harrington. The Harringtons were selling this turquoise through third unnamed parties. Paul Sugar, Jr. gave Defendant the Harrington's phone number. *Id.* at 40:15-21.

19.    Between 2017 and 2019, the No. 8 Turquoise remained in Defendant's possession.

20.     On August 8, 2019, United States Magistrate Judge William G. Cobb in the United

        States District Court of Nevada entered a stipulated preliminary injunction in a federal

        case in the district of Nevada that prohibited Defendant from selling "Number 8

        Turquoise acquired by No. 8 Mine, LLC/David Tackett from Paul Sugar, Sr. and/or Paul

        Sugar, Jr." Ex. 12 at 2-3.

21.     After the Nevada court dissolved the preliminary injunction, on May 14, 2021, Defendant

        entered into a sale and purchase agreement of the No. 8 Turquoise with a third party.

        Doc. 61.

22.     On May 11, 2021, Defendant told Angelo J. Artuso, Plaintiffs' counsel, that the No. 8

        turquoise obtained from Plaintiff was still stored at Bleeker's Boxes. Doc. 49-4 ¶ 3.

23.     One week later, on May 18, 2021, Defendant told Mr. Artuso that he had sold the No. 8

        Turquoise obtained from Plaintiffs to a third party, and it was no longer at Bleeker's

        Boxes. *Id.* ¶ 4.

   B.   **Florida Property**

24.     On July 18, 2017, Plaintiff Paul Sugar, Jr. and his wife, Kim Sugar made an offer on a

        parcel of real property described as Lot 9, Mariners Cove, in Okaloosa County, Florida,

        at 20 Neptune Drive, Mary Esther, Florida, 32569, ("Florida Property"). Ex. 3. The offer

        required an initial deposit of $ 1,000.00. *Id.* The purchase price of the property was $

        260,000.00. *Id.*

25.     On July 20, 2017, All American Turquoise deposited a check in the amount of $ 1,000 to

        an escrow account for the Florida Property ("escrow account"). Ex. 5 at 1.

26.     On August 17, 2017, Paul Sugar, Jr. texted Defendant the name and phone number of his

        realtor. Ex. 4 at 1.

27      On August 25, 2017, at the direction of Defendant, Agent Assent Group, LLC wired 10,000.00 to the escrow account, and then, on September 5, 2017, $220,000.00 to the escrow account. Ex. 5 at 1.

28.     On August 30, 2017, Paul Sugar, Jr. put $ 9,526.98 into the escrow account and on September 8, 2017, he put $6,000 into the escrow account. Ex. 5.

29.     On September 8, 2017, at the direction of Defendant, American Bullion Coin, LLC wired $ 20,000.00 into the escrow account. *Id.*

30.     By September 8, 2017, the escrow account held $280,526.98.  *Id.*

31.     In an undated, recorded, and transcribed conversation, Defendant told the Harringtons, and Steve Tackett, that he bought the Sugars a property in Florida in return for the turquoise and other information. *See* Exs. 10, 11; *see also* Doc. 78-1 at 92:10-20, 94:8-13 (deposition of David Tackett authenticating transcription).

32.     In both conversations Defendant stated that he had paid Plaintiffs $50,000 for the No. 8 Turquoise and $ 200,000.00 as a finder's fee on a separate agreement. Ex 10 at 31; Ex. 11 at 10.

33.     On September 1, 2017, the Florida Property was conveyed by warranty deed to Defendant and Kristin Tackett. The deed was recorded in the official records of Okaloosa County, Florida at Book 3317, Page 2812.  *See* Ex. 6.

34.     By September 13, 2017, Paul Sugar, Jr. had moved into the Florida Property. Ex. 4, text message dated September 13, 2017.

35.     Paul Sugar, Jr. did not pay rent or any other payments while living in the Florida Property. Doc. 102 at 157:3-8.

36.     Between August 16, 2017, and December 8, 2017, there were 63 texts between

        Defendant and Paul Sugar, Jr. None of them mention the No. 8 Turquoise or title to the

        Florida Property.  Ex.  4.

37.     On May 1, 2018, Plaintiff Paul Sugar, Jr. and Kimberly Sugar asserted claims in the

        Florida Property with a notice recorded in Okaloosa County Florida. The notice stated

        that Paul Sugar, Jr. had an agreement that Defendant would pay for the Florida Property

        and that title for that property would be in his name. Ex. 7.

38.     On August 14, 2019, Defendant and Kristin Tackett, conveyed the Florida Property by

        Warranty Deed to CP1, LLC. *See* Ex. 16.

39.     On November 1, 2019, by quitclaim deed, CP1, LLC conveyed the Florida Property to

        CP Holdings, LLC. *See* Ex. 17.

40.     CP Holdings, LLC brought an action for quiet title and ejectment against Paul Sugar, Jr.

        and Kimberly Sugar in the United States District Court for the Northern District of

        Florida (Florida Case). *See* Ex. A.

41.     On January 14, 2021, United States District Judge T. Kent Wetherell entered a "Final

        Judgment" in the Florida Case. *Id.*

## II.  APPLICABLE LAW

        This Court has diversity jurisdiction over this case under 28 U.S.C. § 1332(a)(1). "[I]n a

federal diversity action, the district court applies state substantive law—those rights and

remedies that bear upon the outcome of the suit—and federal procedural law—the processes or

modes for enforcing those substantive rights and remedies." *Los Lobos Renewable Power, LLC

v. Americulture, Inc*., 885 F.3d 659, 668 (10th Cir. 2018). When determining whether there is an

agreement between parties, federal courts apply "ordinary state-law principles that govern the

formation of contracts." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (further citation omitted). Plaintiffs allege that the purported agreement between these parties occurred in New Mexico, so New Mexico law applies. "Under New Mexico contract law, 'to be legally enforceable, a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent.'" *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 959 (10th Cir. 2021) (quoting *Garcia v. Middle Rio Grande Conservancy Dist.*, 918 P.2d 7, 10 (N.M. 1996). The party who asserts that there is a contract has the burden of demonstrating its existence. *Stausberg v. Laurel Healthcare Providers, LLC*, 304 P.3d 409 (N.M. 2013).  Thus, Plaintiffs have the burden to show both that there was a contract and its contractual terms.

## III.  ANALYSIS

### A.  Parties' Arguments

Plaintiffs contend that Defendant wrongfully induced them, through fraud or misrepresentation, into an oral contract for the sale of No. 8 Turquoise, and that the terms of that contract established a sales price of $500,000.00 if paid within 60 days and $560,000.00 thereafter. Defendant disagrees with both allegations. He argues that Plaintiffs have failed to prove the existence of a contract because (1) the absence of a written agreement for a sale of goods of more than $ 500.00 violates the statute of frauds, and (2) the parties never agreed on terms. Defendant further asserts that the only agreement between he and Plaintiff involved the financing of the Florida Property and in that agreement, the No. 8 Turquoise served as collateral. Plaintiff disagrees, stating that the purchase of the Florida Property was a separate agreement that Defendant also breached.[3]

---

[3]At trial and in their pre-trial briefing, the parties contest the validity of this second agreement. Although Plaintiffs made allegations regarding a second agreement in the Complaint, they do not corollate the second agreement with the Florida Property, which is never mentioned. Rather, Plaintiffs allege that Defendant refused to pay them for the

B. **Misrepresentation and/or Fraud**

First, Plaintiffs allege that Defendant wrongfully coerced their agreement by negligently misrepresenting or fraudulently misrepresenting that the No. 8 Turquoise they possessed might be subject to the 2009 injunction. *See* Doc. 102 at 31:8-12.  To establish negligent misrepresentation in New Mexico, a claimant must show five elements: (1) an untrue statement, (2) made by one who has no reasonable ground to believe the statement is true, (3) on which the speaker intends the listener to rely, (4) on which the listener did rely, and (5) the reliance caused harm to the listener.  *See Sawyer v. USAA Ins. Co.,* 912 F. Supp. 2d 1118, 1146-47 (D.N.M. 2012).  To demonstrate fraud, a claimant must show that a defendant made "(1) a misrepresentation of fact, (2) with either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation." *Williams v. Steward*, 112 P.3d 281, 290 (N.M. Ct. App. 2005). (N.M. 1996). The two torts differ primarily in the intent element. Negligent misrepresentation occurs when a defendant negligently makes a false statement whereas fraud requires a reckless or deliberately false statement.

In both torts, at the outset, a claimant must show a false statement. Defendant admits telling the Plaintiffs that their No. 8 Turquoise might be subject to the injunction. But Plaintiffs have not shown that this statement was false. The evidence shows that Mr. Jennings and Defendant had a partnership to recover the Ward Turquoise. *See* Ex. F at 18-21.  Mr. Jennings testified that "[t]he permanent injunction gave me the rights to go back and purchase [the Ward

---

No. 8 Turquoise unless and until Defendant made a deal with the Harringtons to purchase their No. 8 Turquoise. *See* Doc. 1 ¶ 32.

However, Plaintiffs did not amend their Complaint to add a claim about this alleged second agreement and the Florida Property, and Defendant did not file a Counterclaim. The facts the parties have introduced suggest that the parties did not make the second agreement in New Mexico nor did it involve any property or goods in New Mexico. Neither party has identified or briefed the applicable law. Moreover, the purported second agreement will not resolve or affect the Court's decisions on the issues squarely before it, so the Court will not examine it further.

Turquoise] from whoever had it." *Id.* at 21:1-4. Although later, the relationship between Mr. Jennings and Defendant became the subject of a lawsuit, during negotiations regarding Plaintiffs' No. 8 Turquoise, that partnership was still in place.

The parties also concur that in 2017 there was some debate about whether the No. 8 Turquoise Plaintiffs bought from the Harringtons was subject to the 2009 injunction. Remarkably, this issue has never been conclusively resolved. Two years after the parties' negotiation, ownership of the No. 8 Turquoise acquired from Plaintiffs by Defendant was contested in yet another federal case. On August 8, 2019, a federal district court in Nevada entered a second injunction that prohibited Defendant from dispossessing himself of the No. 8 Turquoise he acquired from Plaintiffs until a determination about ownership could be made. *See* Ex. 12. Tellingly, Mr. Jennings still questions the origin of Plaintiffs' No. 8 Turquoise. Before the bench trial in this case, on April 8, 2022, Mr. Jennings testified that he believes that Plaintiffs' No. 8 Turquoise came from the Ward estate. *See id.* at 15:17-22. The Court finds that Defendant's statement that the No. 8 Turquoise might be subject to the 2009 injunction was not false. It is less clear whether Defendant accurately portrayed the extent of his right to purchase Plaintiffs' No. 8 Turquoise through the 2009 injunction.

The second element necessary to establish a fraudulent misrepresentation requires Plaintiff to show reliance. Reliance is an essential element of fraud. *See Saylor v. Valles*, 63 P.3d 1152, 1159 (N.M. Ct. App. 2002) (citing *Gouveia v. Citicorp Person-to-Person Fin. Ctr., Inc.*, 686 P.2d 262, 266 (N.M. Ct. App. 1984)). To show reliance, a claimant must demonstrate that "a particular misrepresentation of fact induced the victim to act in a way the victim would not have otherwise acted." *State v. Garcia*, 384 P.3d 1076 (N.M. 2016). "Circumstances constituting fraud must be stated with particularity." *Saylor*, 63 P.3d at 1159.

Paul Sugar, Jr. testified that he decided to sell the No. 8 Turquoise for three reasons: (1) the threat of the 2009 injunction; (2) his need for money to purchase the Florida Property, and (3) the assurances from his inner circle that Defendant was trustworthy. *See* Doc. 102 at 37:2-6. Only the first of these three reasons was allegedly a misrepresentation made by Defendant. Significantly, Paul Sugar, Jr. did not testify that he weighed the risk of the 2009 injunction more heavily than he weighed the others in his decision to enter an agreement with Defendant. Indeed, the other two elements seem to have factored more strongly into his decision.

Paul Sugar Jr.'s texts to Defendant and the rapid transfer of the Turquoise to Flagstaff and money into an escrow account demonstrate that Paul Sugar Jr's desire to finance the Florida Property significantly drove his decision to sell the No. 8 Turquoise to Defendant.[4]  Reassurances from Paul Sugar, Jr.'s trusted circle also played a meaningful role in this decision. *See id.* at 29:23-24, 30:1-3. In fact, Paul Sugar, Jr. believed that he was selling the No. 8 Turquoise both to Defendant and to members of Paul Sugar, Jr.'s inner circle. Paul Sugar, Jr. testified "My understanding was that [the trusted circle] were partners with [Defendant] on this gathering up all of the No. 8. They also reassured me that due to the fact that there were three of them and Mr. Tackett being the fourth partner, they were all 25 percent owners, so they would have 75 percent say and I would be protected." *Id.* at 59:9-10.

In contrast, Paul Sugar, Sr. testified that he would not have permitted Defendant's representatives to take the No. 8 Turquoise but for Steve Tackett's statement, "Look if you don't let it go, we can take it because my son has an injunction against this rock." Doc. 102 at 95:12-

---

[4] At trial, Paul Sugar, Jr. also seemed to suggest that his agreement with Defendant encouraged him to enter into the purchase agreement for the Florida Property. He testified that he only signed the purchase agreement for the Florida Property after he made an agreement with Defendant for the sale of the No. 8 Turquoise. *See* Doc. 102 at 64:-23-25, 65:1-4 Under cross examination, Paul Sugar, Jr. later agreed that they had come to an agreement about price and terms around August 16, 2017. *Id.* at 60:3-4, 69:6-7.

14.  Notably, Paul Sugar, Sr.'s statement does not suggest that he would not have sold the No. 8 Turquoise to Defendant. Indeed, Paul Sugar, Sr. also testified that he played no role negotiating the agreement and on the day the No. 8 Turquoise was moved to Flagstaff, he did not know the terms of the agreement. Even if Steve Tackett's statement on August 17, 2017 convinced Paul Sugar, Sr. to turn over the No. 8 Turquoise, six days later, on August 23, 2017, Defendant provided Paul Sugar, Sr. with a handwritten note stating that he did not believe that Paul Sugar, Sr. had wrongfully obtained the No. 8 Turquoise. *See* Ex. 8. Defendant delivered this note before the full execution of the agreement.

In sum, Plaintiffs have failed to show that they relied on Defendant's statement about the 2009 injunction when deciding to enter into an agreement with Defendant. The Court finds that Defendant did not make negligent misrepresentations or fraudulent misrepresentation to Plaintiffs.

### C.  Existence of contract

Defendant argues that Plaintiff have failed to establish a valid contract because they have not produced a writing memorializing their agreement. New Mexico has adopted Article 2 of the Uniform Commercial Code (UCC) which governs the sale of goods. As defined by the UCC, "'[g]oods' means all things . . . which are movable at the time of identification to the contract for sale." NMSA 1978 § 55-2-105(1). No. 8 Turquoise meets this definition and so, is a "good."

In a provision known as the "statute of frauds," contracts for the sale of goods of $500.00 or more are not enforceable through an "action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . .." NMSA 1978 § 55-2-201(1). At trial, Jack Elkins, a non-party, testified that when he picked up the No. 8 turquoise at Paul Sugar, Sr.'s home in

Moriarty, there was a "handwritten agreement written up, which [he] witnessed" and "signed." Doc. 102 at 105:18-20. Later, under cross-examination, Mr. Elkins stated that Defendant "dictated [the agreement] to [him], we wrote it up by hand and put it on the table there with Mr. and Mrs. Sugar, right there, and I remember signing it, and it was two or three other people there that I believed signed it." *Id.* at 112:21-25.

Other than Mr. Elkin's testimony, nothing indicates that the parties documented their agreement. It is undisputed that only Paul Sugar, Sr. was present when the No. 8 Turquoise was removed from Moriarty, both Paul Sugar, Jr. and Defendant were out-of-state. Paul Sugar, Sr. testified that at the time of the transfer, he did not know the terms of the alleged sale, which intimates that he did not participate in the formation of a written contract on August 17, 2017. Mr. Elkins is not a party in this case. But both Plaintiffs and Defendant repeatedly have confirmed that the terms of their agreement were never put in writing. The Court finds that there was no written contract.

A party alleging the existence of an oral contract may argue that the contract is valid because one of three exceptions to the statute of frauds applies. The first is not relevant here as it applies to specially manufactured goods, and neither party has asserted that the No. 8 turquoise was specially manufactured. *See* NMSA 1978 § 55-2-201(3)(a). The other two exceptions excuse the writing requirement "(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or (c) with respect to goods for which payment has been made and accepted or which have been received and accepted." NMSA 1978 § 55-2-201(3)(b)-(c) (internal citation omitted). Plaintiffs do not

squarely address either exception, but functionally, they appear to argue both the second and third.

The exception to the statute of frauds delineated in (b) applies when a party acknowledges the existence of an oral contract. Here, Defendant told the Harringtons that he and Plaintiffs had an agreement for the sale of Plaintiffs' No. 8 Turquoise. In one transcribed conversation Defendant states: "You know I had to buy Paul Sugar a house today because he turned over his turquoise and gave me your guys' information. And so, you know, he was gonna get, like $50,000 for his turquoise and he was gonna get $200,000 for making your deal. . .." Ex. 10 at 31:3-7. In another transcribed conversation, Defendant states, "I know that, basically speaking, Paul is getting paid over time. He's gonna end up with about $ 250,000, fifty for his rock, two hundred for putting you and I together. He's not getting that two hundred if you and I don't come together. That was the finders' fee okay?" Ex 11 at 10:1-6.  The exception described in subsection (b) applies only when the admission is made by "pleading, testimony or otherwise in court that a contract for sale was made." The statements in the transcribed conversations are not testimonial. As such, they alone cannot demonstrate the existence of an oral contract between the parties. But at trial, Defendant testified that he made these statements to the Harringtons, and he affirmed the terms within them. *See* Doc. 102 at 152:13-18; 168:25 ("Yes, I did offer Paul Sugar, Jr., and Sr. $ 250,000.00).

Although Defendant admits that he made these statements, he argues that they show only that he made an offer to Plaintiffs. Id. at 135:23-24. He declares that Plaintiffs never accepted his offer and, therefore, there could have been no agreement. The Court disagrees. The language used by Plaintiff—that he bought a house today, and that Plaintiffs had turned over the No. 8 Turquoise—indicates both the formation and the execution of an agreement.

Even if the exception in (b) did not apply, Plaintiffs have also met the requirements of the third exception in (c). Under (c), a seller may demonstrate the existence of an oral contract by showing that the buyer received and accepted the goods. The UCC defines "receipt of goods" as when a buyer takes "physical possession of them." NMSA 1978 § 55-2-103. There is no debate that Defendant took physical possession of the goods when he removed them from Moriarty to Flagstaff.

Possession alone does not establish the existence of an oral contract. There must also be some indication that a seller has accepted the goods. Acceptance occurs when a buyer:

> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
> (b) fails to make an effective rejection (Subsection (1) of Section 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

NMSA 1978 § 55-2-606.  An "oral or formal acceptance of an offer is not necessary. The general rule is that an offer may be accepted by performance before a revocation." *Keeth Gas Co. v. Jackson Creek Cattle Co.,* 570 P.2d 918, 921 (N.M. 1977). Plaintiff suggests that Defendant manifested his acceptance of the No. 8 Turquoise by retaining the No. 8 Turquoise after inspection. The Court agrees.

Defendant testified both that he would not purchase turquoise unless he had inspected it and that the No. 8 Turquoise was taken to Flagstaff so he could inspect it. Doc.102 at 139:21-23. Paul Sugar, Sr. testified that he and Defendant examined the No. 8 Turquoise sometime on or around August 23, 2017. *See* Doc. 102 at 89:16-21; *see also* Ex. 8 (Defendant's handwritten note for Paul Sugar, Sr. dated August 23, 2017). There is no evidence that Defendant rejected the No. 8 Turquoise within a reasonable period. *See W. Com. Bank v. Gillespie*, 775 P.2d 737, 739 (N.M.

1989) ("[W]here no time for performance of a condition precedent is specified, the law implies a reasonable time within which to perform"). From August 17, 2017, until Defendant sold the No. 8 Turquoise on May 14, 2021, Defendant maintained possession it. Shortly after inspecting the No. 8 Turquoise, Defendant began transferring money into an escrow account for the Florida Property. The Court finds that the statute of frauds does not apply. Defendant both admitted that there was an oral agreement between he and Plaintiffs and Defendant received and accepted the goods.

Next, the parties dispute the sale price. Plaintiffs claim that Defendant offered them $500,000.00 for the No. 8 Turquoise if paid in 60 days and $560,000.00 thereafter. Defendant avers that he would never have offered a specific sum of money until he had inspected the goods, and that his subsequent inspection showed that the No. 8 Turquoise was not worth that much. The evidence supports Defendant's assessment.

Plaintiffs purchased the No. 8 Turquoise from the Harringtons for approximately $30,000.00 to $40,000.00. After purchase, Plaintiffs screened it, cleaned it, and stored it. *Id.* at 25:9-10.  Before negotiations with Defendant, Plaintiffs testified they sold some of the No. 8 Turquoise rough and some cut into stones for $100.00 to $150.00 a pound. Doc. 102 at 28:6-11. Although they provided no documentation of this sale, Plaintiffs suggest that this price per pound was a reliable indicator of the price of the remaining No. 8 Turquoise.[5] But Plaintiffs did not clarify how the sale of a few pieces could determine the price of the whole lot. Plaintiffs did not offer any documentation establishing the market price of their No. 8 Turquoise. Plaintiffs did not demonstrate that the No. 8 Turquoise was of the type that as a whole would command

---

[5] The facts suggest that Plaintiffs sold very little No. 8 Turquoise at this price. After cleaning the No. 8 Turquoise, Plaintiffs had 11,599.04 pounds according to an inventory list dated May 4, 2017 and marked "void." *See* Ex. 1. Plaintiffs sold some of the No. 8 Turquoise before negotiations with Defendant. In these proceedings, they asserted that they sold the same amount of Turquoise to Defendant as the total weight did not change.

$560,000.00 when its purchase price was $30,000 to $40,000 dollars. While Plaintiffs may have added value to the No. 8 Turquoise by cleaning it, they introduced no evidence that cleaning alone could increase its value by $520,000.00.

Defendant counters that he offered a purchase price of $50,000.00. Some evidence indicates that this price is closer to the market value of the turquoise. That sum is more closely aligned with what Plaintiffs actually paid for it. Also persuasive, is Defendant's May 14, 2021 sale of the No. 8 Turquoise for $60,000.00. *See* Doc. 61.

But Defendant disputes that the $50,000.00 ever became a firm offer. He argues that he held the No. 8 Turquoise as collateral to ensure that Plaintiff would repay a "loan." Doc. 102 at 148:20-24. Some evidence supports Defendant's claim. A text message from Paul Sugar, Jr. references arrangements for "interest" payments. A return text from Defendant asks for a payment of $2,500.00 a month and gives instructions about prorating unpaid months and where to send the payment. But it is unclear whether these "interest" payments were related to the No. 8 Turquoise or whether those payments pertained to the terms of a second agreement. Regardless, the Court does not find that Defendant agreed to hold the No. 8 Turquoise as collateral. Defendant was in the business of buying and selling No. 8 Turquoise. He admitted that he was in a partnership to obtain all of it. Given this goal, the Court does not find it plausible that Defendant intended the No. 8 Turquoise to be collateral.

The parties also disagree on whether Defendant fully performed the agreement.[6] Plaintiffs declare that under the agreement, Defendant had a duty to deliver title to the Florida Property. Defendant disagrees. Intuitively, it first appears that because Defendant retained title to the

---

[6] Plaintiff makes much of the fact that the funds Defendant wired to the escrow account came from a third party. Whether Defendant used his own money, borrowed money from a bank, or took funds from a third party is irrelevant to the issues before this Court. It is undisputed that the funds were conveyed by Debtor to Plaintiffs.

Florida Property, Plaintiffs did not actually get paid for the No. 8 Turquoise. But neither does it make intuitive sense that Defendant's $50,000.00 payment, which was slightly less than one fifth of the total purchase price for the Florida Property, would require the delivery of title. On this issue there is an ambiguity.

When there is ambiguity in a contractual term, a court may "consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent." *See Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1236 (N.M. 1993) (citing *Am. Bank of Com. v. M & G Builders, Ltd.*, 586 P.2d 1079, 1081 (1978)). When considered as a whole, the circumstances and evidence surrounding the transfer of the No. 8 Turquoise and the purchase of the Florida Property do not suggest that the parties' agreement obligated Defendant to deliver title.

The record demonstrates that the No. 8 Turquoise was moved at or around the same time Paul Sugar, Jr. was attempting to close a sale on the Florida Property. Although Plaintiffs argue that Defendant's representatives came to pick up the No. 8 Turquoise without giving them advance notice, the evidence shows that Paul Sugar, Jr. sent a text message with his father's address on August 16, 2017, the day before Defendant's representative arrived to transport the No. 8 Turquoise. On August 17, 2017, the day the No. 8 Turquoise was picked up, Paul Sugar, Jr. sent a second text message to Defendant with the name and number of his realtor for the Florida Property.

After inspecting the No. 8 Turquoise at Bleeker's Storage on or about August 23, 2017, on August 25, 2017, Defendant wired $10,000 into the Florida Property's escrow account. Text messages between Defendant and Paul Sugar, Jr. during this period establish that these transfers occurred per Paul Sugar, Jr.'s instructions.  On August 24, 2017. Paul Sugar, Jr. texted Defendant

"I just need to verify the deal for tomorrow so the Michael can have it ready is [sic] $10,000 earnest money till next Friday." The following day, Paul Sugar, Jr. texted Defendant "the transfer arrived now so thank you don't need to bother your bank."  Later, on September 1, 2017, the closing date for the Florida Property, Paul Sugar, Jr. sent Defendant several texts asking why he had not completed another monetary transfer. Similar texts messages were sent on September 5 and 6, 2017.  On September 5, 2017, Defendant wired $220,000.00, and on September 8, he wired $20,000.00 into the Florida Property escrow account. The text messages from Plaintiff asking that money be transferred and the subsequent transfers in accordance with those requests, coupled with the movement of the No. 8 Turquoise demonstrates the substance of the parties' agreement. Paul Sugar, Jr. signaled his satisfaction with Defendant's performance when he sent a text on September 13, 2017, thanking Defendant "for getting us our house we also love it." Ex. 4. None of the 63 texts exchanged before and after the purchase of the Florida Property mention or ask Defendant to deliver title.[7]

Finally, the Court finds that Plaintiff did benefit from his arrangement with Defendant. Plaintiff lived in the Florida Property for at least 40 months.[8] During that period, he did not make any payments to Defendant or any other party for the right to live there. A text from Defendant suggests that the fair market rental price of the Florida Property was $2,500.00.  If Plaintiffs had made that payment, they would have expended approximately $100,000.00 during that period, which is a $50,000.00 benefit over the agreed sales price.

---

[7] At trial, Paul Sugar, Jr. testified that he did not know that the Florida Property was titled in Defendant's name at the time of the purchase. He testified that an addendum to the purchase contract with he and his wife's electronic signature permitted this change to be made. He further testified that he and his wife did not agree to this change. Although Exhibit 3 includes one addendum, it does not include this addendum, so the Court will not consider this argument further here.
[8] Paul Sugar, Jr. moved into the property in September 2017. The Court entered a Judgment on the title dispute to the Florida Property on January 14, 2021.

**E.   The Covenant of Good Faith and Fair Dealing and Unjust Enrichment**

Alternatively, Plaintiffs maintain that Defendant's obligation to transfer title to the Florida Property was an implied term in their agreement. Defendant violated that contractual term and breached the contract, Plaintiffs contend, when Defendant transferred title to the Florida Property to a third party. Otherwise, Plaintiffs assert that this transfer deprived Plaintiffs of the benefit of the agreed price and unjustly enriched Defendant.

In New Mexico, "'[w]hether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement. Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement.'" *Salas v. Mountain States Mut. Cas. Co.*, 202 P.3d 801, 805 (N.M. 2009). The purpose of the implied covenant is to make "effective the agreement's promises." *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909, 925 (N.M. 2003).  Unlike the covenant of good faith and fair dealing, which is implied in contract, unjust enrichment is an equitable remedy for when "a party cannot claim relief in contract and instead must seek refuge in equity." *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 698-699 (N.M. 2000).

It is incumbent on Plaintiffs to show the terms of an oral agreement. Here, the evidence does not show that Defendant had an obligation to deliver title to the Florida Property in return for the No. 8 Turquoise. Plaintiffs have established only that Defendant was required to transfer $ 50,000.00 into an escrow account. But even if Plaintiff had shown an additional express contractual term regarding title, that claim is not properly before this Court.

Plaintiffs litigated their title claims to the Florida Property in a Florida federal district court. Ultimately, the case concluded with an agreement that CP Holdings, LLC held the Florida

Property in fee simple. Subsequently, on January 14, 2021, the Florida federal district court entered a final judgment.

Plaintiffs' claims based on the covenant of good faith and fair dealing and unjust enrichment are a collateral attack on that settlement agreement.[9] As stated in the final judgment, "Defendants Paul Sugar and Kimberly Sugar and those parties claiming, by through, under or against Defendants are perpetually enjoined from asserting any right, title, claim or interest in or to the Subject Property." Ex A at 3. As the settlement agreement bars Plaintiffs from asserting any claims to title, Plaintiffs are precluded from advancing claims here under the implied covenant of good faith and fair dealing or unjust enrichment.

### F. Conversion

Plaintiffs also allege that Defendant wrongfully converted their property when he sold the No. 8 Turquoise in May 2021. Conversion is "'the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made.'" *In re Venie*, 395 P.3d 516, 526 (N.M. 2017) (quoting *In re Yalkut*, 176 P.3d 1119, 1126 (N.M. 2008). There are many forms of conversion. *See Case Credit Corp v. Portales Nat. Bank*, 966 P.2d 1172, 1175 (N.M. 1998) (Minzner J., dissenting) (observing that the Reinstatement (Second) of Torts § 223 (1965) lists seven ways in which the tort may be committed). Plaintiff bases his conversion claim on "demand and refusal." To prove conversion based on demand and refusal, Plaintiff must show (1) that the plaintiff had the right of possession of personal property; (2) that the plaintiff demanded that the defendant return the property to plaintiff; and (3) that the defendant refused to return the property to plaintiff." *Nosker v. Trinity*

---

[9] Plaintiffs filed their Complaint in this Court before the Settlement Agreement so these claims were plausible then.

*Land Co.*, 757 P.2d 803, 808 (N.M. Ct. App. 1988) (citing Restatement (Second) of Torts § 237 (1965) (additional citation omitted)).

At the first step, Plaintiffs must show that at the time of the alleged conversion, they had "a right to immediate possession" of the No. 8 turquoise based on an "ownership interest." The Court has found that Plaintiffs sold the No. 8 Turquoise to Defendant under a fully executed contract. As Defendant had lawful possession of the No. 8 Turquoise, he could not and did not convert Plaintiffs' property.

## IV.  CONCLUSION

Plaintiffs entered into an oral agreement with Defendant for the sale of No. 8 Turquoise. Defendant did not coerce Plaintiffs into entering this agreement with fraud or misrepresentations. The agreed sale price for the No. 8 Turquoise was $50,000. Plaintiffs delivered the No. 8 Turquoise to Defendant on August 17, 2017, and Defendant paid Plaintiff with a series of wire transfers between August 25, 2017, and September 8, 2017, into an escrow account for a Florida Property. As the parties fully executed the contract in 2017, Defendant lawfully possessed the No. 8 Turquoise. Therefore, when Defendant sold the No. 8 Turquoise on May 14, 2021, he did not breach the sale contract or commit conversion.

IT IS ORDERED THAT:

The Court finds in favor of Defendant:

1.      Plaintiffs' claims are DENIED as follows:

      (a) the breach of contract claim is denied with prejudice;

      (b) the breach of the covenant of good faith and fair dealing claim is denied without prejudice;

      (c) the claim of conversion is denied with prejudice;

(d) the claim of misrepresentation is denied with prejudice;

(e) the claim of fraud is denied with prejudice; and

(f) the claim of unjust enrichment is denied without prejudice;

2.     The parties' will pay their own attorney's fees and bear their own costs.


_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE